UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| JACQUELINE CARTER AS NEXT OF FRIEND FOR WILLIAM H. CARTER | CIVIL ACTION NO. 17-1289 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CITY OF SHREVEPORT, ET AL. | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Summary Judgment filed by Defendants City of Shreveport ("Shreveport"), Corporal Louis Butler ("Butler"), Corporal Jennifer Hurst ("Hurst"), Corporal Julie Smith Pfender ("Pfender"), Lieutenant Joseph Dews,[1] Captain Debbie Strickland ("Strickland"), and Jailers Tantunika Tobin ("Tobin"), Trineice Nesbitt ("Nesbitt"), Barbara Norsworthy ("Norsworthy"), and Alfredo Lofton ("Lofton"). See Record Document 43. Plaintiff opposes the Motion. See Record Document 57. Defendants have filed a reply to Plaintiff's opposition. See Record Document 77. For the reasons that follow, summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

**FACTUAL AND PROCEDURAL BACKGROUND**

The instant suit arises from allegedly inadequate medical care provided to William Carter ("Carter") while he was jailed at the Shreveport City Jail from October 10 through October 18, 2016. See Record Document 20. Many of the facts central to this matter are

---

[1] Lieutenant Joseph Dews ("Lt. Dews") is named as a Defendant in this action as the "Lieutenant in charge of the Shreveport City Jail." See Record Document 20 at ¶4(d). However, Lt. Dews was not transferred to this position until nearly a year after the relevant events had transpired. See Record Document 43-13 at Ex. 10. Plaintiff does not contest his dismissal from this suit, and therefore all claims against Lt. Dews are hereby **DISMISSED**.

contested. In the context of this motion they must be viewed most favorably to the non-moving party—the Plaintiff. Thus, the Court notes that Plaintiff's pleadings and memoranda accompanying this motion form the basis of its analysis.

Carter has been paralyzed from the waist down for over a decade as a result of a gunshot wound to his abdomen at age sixteen and must use a wheelchair for mobility. See Record Document 57-1. Carter has a history of physical and mental health problems, including for present purposes, severe stage IV pressure ulcers (commonly known as and hereinafter "bed sores") on his hip and buttocks. See id. The nature and extent of these bed sores require daily bandage changing and frequent turning or repositioning while in bed in order to prevent aggravation and possible infection of these bed sores. See Record Document 20 at 6.

Carter was arrested on October 10, 2016 at his home by Pfender for the unauthorized use of 911, after making several phone calls to dispatch for non-emergency purposes. See id. at 5. He was transported to the Shreveport City Jail in a handicapped van by Butler and Hurst, before undergoing intake screening from Tobin, Lofton, and Nesbitt. See id. Carter was agitated upon his arrival, and officers were unable to complete the formal booking process until two days later. See Record Document 57-1. While in jail, Carter was kept in an isolated cell that he claims was not handicap accessible to an appropriate degree. See Record Document 20 at 6. Carter was not turned or repositioned by jailers during his eight days in the Shreveport City Jail, nor was he aided in changing his bandages. See id.

On October 12, Carter was evaluated on "sick call" by Dr. Tymwa Dixon ("Dr. Dixon"), who provided 4x4 gauze and advised continuous bandage changes from wet to

dry dressings in order to protect his bed sores from worsening. See Record Document 57-1 at 4. Carter saw Dr. Dixon again on October 17, and although Dr. Dixon opined that hospitalization was not required, he did reach the decision that Carter needed more care than jail officials could provide. See id. The following day, Carter pled guilty to the charged ordinance violation, was released from custody by Norsworthy, and allowed to return home. See id. Immediately after his release Carter visited with his primary physician, but did not direct the doctor to examine his bed sores or explain that he had just spent a week in jail. See Record Document 57-7 at AI. Carter was ultimately hospitalized on November 2 for the infection of his bed sores and spent nearly six weeks in the hospital, which Plaintiff claims had a detrimental effect on both Carter's physical and mental health. See Record Document 20 at 7.

Carter's mother is the Plaintiff in this suit. On behalf of her son, she claims Defendants (1) failed to provide medical care in violation of her son's constitutional rights, (2) violated her son's rights under the Americans with Disabilities Act ("ADA"), and (3) were negligent under Louisiana law. See Record Document 20.

## LAW AND ANALYSIS

### I.     Summary Judgment Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). When reviewing a motion for summary judgment,

the court must view "all facts and inferences in the light most favorable to the non-moving party." Romero v. City of Grapevine, Texas, 888 F.3d 170, 175 (5th Cir. 2018). But the non-moving party "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a 'scintilla of evidence.'" Hathaway v, Bazanay, 507 F.3d 312, 319 (5th Cir. 2007).

## II.  Analysis

In the instant Motion, Defendants argue officers were not "deliberately indifferent" to Carter's medical needs, and thus did not deprive him of his constitutional rights in violation of 42 U.S.C. § 1983. See Record Document 43. If these claims withstand summary judgment, Defendants stress the defense of qualified immunity should apply and protect them from suit. See id. Additionally, Defendants argue the causation element is lacking for both Plaintiff's § 1983 and state law negligence claims. See id. Finally, Defendants argue the City of Shreveport did not violate the ADA. See id.

### A. Deliberate Indifference

The United States Supreme Court has held "deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." Estelle v. Gamble, 429 U.S. 97, 105, 97 S. Ct. 285, 291 (1976); see also Hare v. City of Corinth, 74 F.3d 633, 636 (5th Cir. 1996). The test for deliberate indifference is a subjective one, requiring that prison officials (1) were aware of facts from which an inference of excessive risk to the prisoner's health could be drawn and (2) actually drew an inference that such potential for harm existed. See Herman v. Holiday, 238 F.3d 660, 664 (5th Cir. 2001); see also Farmer v. Brennan, 511 U.S. 825, 837, 114 S. Ct. 1970, 1979 (1994). Such a showing

requires evidence that officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." Domino v. Texas Dept. of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001). "Deliberate indifference is an extremely high standard to meet." Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985).

Plaintiff's suit claims each of the officers Carter encountered failed to provide him sufficient medical care for his bed sores.[2] See Record Document 20. Consequently, Defendants' Motion for Summary Judgment discusses each individual's role in the relevant events. See Record Document 43. The named officers, with the exception of Strickland, can be grouped according to whether their interactions with Carter occurred during his arrest or while he was jailed. The Court will analyze Plaintiff's deliberate indifference claims against the officers according to this grouping, prior to discussing Plaintiff's claims against Strickland and the City of Shreveport.

### i.   Arresting Officers

Cpls. Butler, Hurst, and Pfender participated in Carter's arrest on October 10, 2016. Butler was the officer responsible for transporting Carter to the Shreveport City Jail in a handicapped van. See Record Document 57 at 4. Hurst was the initial officer to interact with Carter, responding to the 911 calls that ultimately led to his arrest. See Record Document 43-1 at 18. She was at the end of her shift and handed off the scene to Pfender but informed the supervising sergeant on-scene of Carter's bed sores. See

---

[2] The Fifth Circuit has held a paraplegic's bed sores represent a serious injury for § 1983 deliberate indifference claims. See Lawson v. Dallas County, 286 F.3d 257, 282 (5th Cir. 2002).

Record Document 57 at 5. Pfender was the arresting officer on-scene and was also informed by Hurst and Plaintiff of Carter's bed sores. See Record Document 57 at 3.

Plaintiff argues each of these officers were aware of Carter's open and deteriorating bed sores at the time of his arrest and should have called the Shreveport Fire Department, in accordance with department policy, to determine whether Carter should be taken to a hospital or jail. See id. at 3-5. Defendants argue a serious medical situation was not present, as evidenced by Carter's presence at home at the time of his arrest, and nevertheless, none of the officers could have been aware of such a serious situation prior to transportation. See Record Document 43-1 at 17-19.

Examining the summary judgment evidence in the light most favorable to the Plaintiff, a genuine dispute of material fact remains and the claims against the arresting officers must be permitted to proceed. According to several officer depositions, if an individual has open wounds at the time of arrest, it is department policy to call the Shreveport Fire Department to determine whether the individual shall be taken to a hospital instead of jail. See Record Document 57-2 at Ex. JH; 57-3 at Ex. LB; 57-7 at Ex. AC; 57-7 at Ex. DS. Deposition evidence presented thus far indicates that Plaintiff informed officers of the severity of her son's bed sores prior to his transportation to jail. See Record Document 43-15. Pfender admits Plaintiff told her of her son's open bed sores. See Record Document 43-20. Hurst is seen on video discussing Carter's bed sores that were "down to the bone" with her supervising sergeant. See Record Document 57-2 at Ex. JH. While Butler stresses he never heard any discussion of bed sores at the scene, he did discuss the possibility of taking Carter to a hospital with Pfender while at the Shreveport City Jail shortly after delivering Carter, and acknowledges that any officer who

becomes aware of an open wound should call the Shreveport Fire Department. See id. at Ex. JDP; 57-3 at Ex. LB.

Carter's bed sores were certainly not visible to officers at the time of arrest, nor were they ever explicitly asked to take him to a hospital for treatment. See Record Document 43-20. Given that Carter was residing at home prior to his arrest, he may not have required hospitalization at that time. See Record Document 43-14. Nevertheless, department policy required the Shreveport Fire Department to be called to medically evaluate Carter prior to his transportation to jail. This possibility was discussed by officers, who ultimately opted to let the jailers decide the proper place for Carter rather than decide for themselves. See Record Document 43-19; Record Document 43-21. While the arresting officers may be able to demonstrate they lacked the required subjective refusal to medically care for Carter at trial, a factual dispute as to whether deliberate indifference was exercised still remains at this stage.

### ii. Shreveport City Jail Officers

Jailers Tobin, Nesbitt, Norsworthy, and Lofton each interacted with Carter over the course of his eight days in jail. See Record Document 20 at ¶6. Tobin and Lofton were intake officers, with Lofton and Nesbitt performing the intake screening. See id. Norsworthy released Carter from jail on October 18. See id. at ¶ 11.

Plaintiff argues each of these officers were aware of Carter's bed sores and failed to provide adequate medical care leading to their deterioration. See Record Document 57 at 10. Specifically, Plaintiff believes the Jailers should have repeatedly repositioned Carter and assisted him in changing his bandages. See id. Defendants argue Carter was

able to prevent deterioration through self-repositioning and showering, never asked for assistance with his bandages, and was combative with officers to the extent they could not aid him. See Record Document 43-1 at 20-22.

At this stage, the facts presented preclude summary judgment. Carter's limited mobility was certainly apparent to officers upon his arrival at the Shreveport City Jail. When changing into his orange jumpsuit, Carter's wounds would have been noticed. See Record Document 57-8. According to Plaintiff, she called the Jail daily to inquire about her son and his bed sores. See Record Document 43-15. Even given Carter's behavior and jailers' inability to properly screen him until October 12, documentation shows that he alerted officers of his bed sores on this date. See Record Document 43-6; 57-15. He was subsequently placed on "sick call" and evaluated by Dr. Dixon, who gave him gauze and recommended daily wet to dry dressing changes to prevent infection. See Record Document 43-10. Dr. Dixon included in his instructions that Carter would require assistance with his dressing changes. See Record Document 57-5 at Ex. TD-1.

Carter states he asked a guard how he could be expected to change his bandages himself. See Record Document 57-6 at Ex. WC. Jailers were aware that Carter had dressing changes in his cell, and many officers have recognized Carter would have had difficulty changing his bandages on his backside due to his paralysis. See Record Document 57-5 at Ex. SB; 57-7 at Ex. AC; 57-4 at Ex. TT. It remains unclear whether the Jailers were aware of the worsening of Carter's bed sores, given the possibility of a stench and the supervision of Carter while in the shower throughout his stay. See Record Document 57-6 at Ex. WC; 43-27.

Once again, Defendants may be able to prove they were unaware of the severity of Carter's wounds or his inability to care for himself to prevent their deterioration. They may also demonstrate they were unable to treat Carter due to his argumentative behavior. However, these disputes are best resolved by the trier of fact, rather than at the summary judgment level.

### iii.  Supervisor Liability

To establish supervisor liability under § 1983, a plaintiff must show (1) failure to supervise or train subordinate employees, (2) a causal connection between this failure and the deprivation of rights, and (3) the failure to supervise or train amounted to deliberate indifference to plaintiff's constitutional rights. See Roberts v. City of Shreveport, 397 F.3d 287, 292 (5th Cir. 2005). Thus, while a supervisor may have no direct contact with an injured plaintiff, his or her liability may stem from the acts or omissions of subordinates. See Doe v. Taylor Ind. Sch. Dist., 15 F.3d 443, 453 (5th Cir. 1994).

Strickland is the lead supervisor of the Shreveport City Jail. See Record Document 57-7 at Ex. DS. Although she has no recollection of interacting with Carter while he was imprisoned, she recognizes that she directly supervises the jail officers responsible for his medical care. See id. According to Strickland, her subordinates were not subject to training on how to medically care for handicapped individuals, despite receiving an estimated three to four wheelchair individuals per month. See id. Perhaps consequently, Strickland is adamant throughout her deposition that it is against the policy of the Shreveport City Jail to accept and house any wheelchair-bound individuals, regardless of their health status. See id. She believes the Jail cannot adequately care for these

individuals and states that had she known Carter was being housed in her Jail, she would have ordered him transferred to a hospital immediately. See id.

In direct contravene to these orders, Carter was not only admitted into the Jail despite his disability, but he was allowed to remain under the supervision of Strickland's jailers for over a week. According to Plaintiff, this lengthy stay without proper medical attention led Carter's bed sores to worsen and ultimately required hospitalization. Clearly a disconnect between Strickland and her subordinates existed with respect to her instructions as to accepting and housing handicapped individuals. There is a genuine dispute of material fact as to Strickland's failure to train her officers as to this policy and the lack of supervision as to the implementation of it. Trial is the appropriate stage to hear evidence as to why this occurred. As such, summary judgment cannot be granted with respect to Strickland.

### iv. Municipal Liability

The Fifth Circuit has held supervisor and municipal liability follow the same standard, as either may be liable if it "supervises its employees in a manner that manifests deliberate indifference to the constitutional rights of citizens." Doe v. Taylor Ind. Sch. Dist., 15 F.3d 443, 453 (5th Cir. 1994). To succeed in holding a municipality liable for deliberate indifference, the plaintiff must establish not only that an employee of the municipality acted with subjective indifferent intent, but also that the employee's actions resulted from a policy or custom adopted or maintained with objective deliberate indifference to constitutional rights. See Olabisiomotosho v. City of Houston, 185 F.3d 521, 526 (5th Cir. 1999).

Plaintiff argues the City of Shreveport's deliberate indifference to the medical needs of its prisoners is visible through its inconsistent policy towards jailers changing bandages and its lack of a nurse position. See Record Document 57 at 20. Defendants argue that Plaintiff cannot establish any individual officer was deliberately indifferent, nor does Plaintiff demonstrate that the lack of a nurse position constitutes deliberate indifference. See Record Document 43-1 at 22-23; Record Document 77 at 6.

As has been discussed, a genuine dispute of material fact remains with respect to whether municipal employees acted with subjective indifferent intent. However, a similar dispute does not exist as to whether the officers' lack of action flowed from a policy or custom of the City of Shreveport, and therefore, a § 1983 action against the municipality may not proceed.

Plaintiff has produced evidence that jailing officers receive only basic first aid training and their changing of bandages on prisoners is prohibited. See Record Document 57-2 at Ex. JS. Strickland's desire for an on-site nurse to provide more consistent in-house medical care and Jail Commander Joe Smith's rejection of this proposal are also documented. See id; Record Document 57-7 at Ex. DS. However, the municipal policies in place—Dr. Dixon's weekly schedule and required transfer to a hospital for serious medical situation—do not reflect deliberate indifference. To the contrary, together these policies should afford prisoners adequate medical care either through a licensed physician at the Jail itself or a nearby hospital. The alleged failure of these policies as it pertains to Carter may have been the result of the individual Defendants' actions, but the injuries he suffered were not the result of objective deliberately indifferent policies

adopted by the City of Shreveport. As such, summary judgment with respect to Plaintiff's § 1983 claims against the municipality is hereby **GRANTED.**

### v.   Qualified Immunity

Although factual disputes still remain with respect to Plaintiff's claims of deliberate indifference, the defense of qualified immunity could prevent these claims from progressing forward. Qualified immunity protects government officials against individual liability for civil damages, "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808 (2009). A two-pronged analysis is used to evaluate whether a defendant is entitled to qualified immunity and asks whether "the officer's conduct violated a constitutional right, and whether the right at issue was clearly established at the time of the alleged misconduct." McCreary v. Richardson, 738 F.3d 651, 654 (5th Cir. 2013).

A qualified immunity defense alters the usual summary judgment burden of proof, by shifting it to the plaintiff, who then "must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law." Brown v. Callahan, 623 F.3d 249, 253 (5th Cir. 2010). Although the plaintiff bears the burden of negating qualified immunity, all inferences remain drawn in his favor. See id.

As has already been established, a genuine dispute of material fact exists as to whether Defendants acted with deliberate indifference toward Carter's serious medical needs in violation of his constitutional rights. Nevertheless, the Court must still determine

the appropriateness of qualified immunity by asking whether "the defendant's actions were 'objectively reasonable' in light of 'law which was clearly established at the time of the disputed action.'" Id; Collins v. Ainsworth, 382 F.3d 529, 537 (5th Cir. 2004). The Fifth Circuit has held that pretrial detainees have a clearly established Fourteenth Amendment right not to be denied, by deliberate indifference, attention to serious medical needs. Hare, 74 F.3d at 650.

The deposition evidence reveals widespread awareness by the jailing officers of this right. See Record Document 57-4 at Ex. TT; 57-3 at Ex. LB. Many recognize the practical difficulties Carter would have experienced if he were tasked with changing his bandages himself, given their location and his disability. See Record Document 57-7 at Ex. AC; 43-23. Although the arresting officers may have a stronger argument for the reasonableness of taking Carter to jail and allowing the jailers to decide whether a hospital was a more appropriate destination, the stated policy of calling the Shreveport Fire Department to make that determination was not followed. See Record Document 57-3 at Ex. LB; 57-2 at Ex. JH. Given the evidence presented thus far, viewed in Plaintiff's favor, the Court cannot grant qualified immunity to Defendants at this stage.

### B. Causation

Defendants' Motion makes the additional argument that Carter's time in the Shreveport City Jail cannot be established as the cause for the deterioration of his bed sores. See Record Document 43-1 at 23. As a result, they argue, Defendants cannot be liable under § 1983 for failure to provide medical care nor under state law negligence principles. See id. at 24. Although Plaintiff does not independently address the issue of causation, she does allege the officers' failure to adequately treat Carter worsened the

state of his bed sores throughout her opposition. See Record Document 57. In reply, Defendants reiterate summary judgment is appropriate because Plaintiff has failed to provide medical expert testimony demonstrating the size and condition of Carter's wounds worsened between his pre-jail hospital visit and his subsequent stay for an infection. See Record Document 77 at 7.

Since his paralysis at age sixteen, Carter has suffered from bed sores and required daily assistance from the Plaintiff, his mother. See Record Document 43-14. In her opinion, Carter's bed sores were the worst she had ever seen them after his release from jail, and she estimates they had grown in size by approximately 15% since his arrest. See Record Document 43-15; Record Document 66. Carter was seen at CHRISTUS Health prior to his arrest on September 15, 2016, and no infection of his bed sores was reported. See Record Document 57-9. Carter's primary physician, Dr. Ibrahim, saw Carter immediately following his jail stint, but was not directed to examine his bed sores. See Record Document 43-16. Dr. Ibrahim's deposition testimony recognizes infrequent bandage changes or movement while in jail could have led to infection. See Record Document 57-7 at Ex. AI. However, Dr. Ibrahim also acknowledges that Carter's infection may have developed between his time in jail and his hospitalization on November 2. See Record Document 57-7 at Ex. AI. During this hospitalization stint, Carter explained to doctors on November 5 that his treatment lapsed during a recent eight-day stay in jail, where he was unable to receive the care he normally does from Plaintiff. See Record Document 57-10.

Defendants urge the Court to grant summary judgment on the issue of causation and dismiss Plaintiff's claims due to a lack of expert medical testimony demonstrating

deterioration of Carter's wounds occurred while he was in jail. See Record Document 77 at 7-8. In support, they cite to several cases where such a lack of expert evidence was fatal to plaintiffs' showings of causation. See id. However, these and other cases within this Circuit stand for the proposition that medical expert testimony is necessary when the issue of causation cannot be established without such testimony because the matters are "not within the common knowledge of a layperson." Patton v. Boston Scientific Corp., 2018 WL 4760846 at *2 (W.D. La. Oct. 2, 2018); see also Hamburger v. State Farm Mut. Auto. Ins. Co., 361 F.3d 875, 885 (5th Cir. 2004).

The cases Defendants cite are distinguishable from the instant matter in that they involve complex medical issues outside the knowledge and observation of a layperson. See generally Bordenave v. Delta Air Airlines, Inc., 2020 WL 377017 (M.D. La. Jan. 23, 2020) (granting summary judgment for failure to present medical expert testimony when causation issues of degeneration were raised); In re Vioxx Products Liability Litig., 2014 WL 1918048 (E.D. La. May 12, 2014) (plaintiff suffered transient ischemic attack from adverse reaction to defendant's prescription drugs); Patton, 2018 WL 4760846 (products liability action after medical product fractured during heart procedure and remained inside plaintiff's body). The medical issues presented here—bed sores and wound infections—can be testified to by someone without formal medical training. Plaintiff's daily care routine for her son, which has spanned over a decade, makes her all the more fitting as a proper witness.

In further aid of their causation argument, Defendants point to Carter's lengthy history of bed sores, as well as other possible causes of infection such as poor nutrition and suspect hygiene practices, discussed in the expert report of Dr. Inglese. See Record

Document 43-1 at 23; 43-35 at Ex. 30-B. The testimony of Plaintiff and Dr. Ibrahim must be viewed as sufficient to establish a genuine factual dispute on the issue of causation. As such, Defendant cannot be granted summary judgment, and Plaintiff's § 1983 and state law negligence claims may proceed.

### C. ADA Claim

Finally, Defendants seek summary judgment on Plaintiff's claims against Shreveport alleging violation of Carter's rights under the Americans with Disabilities Act and the Rehabilitation Act. See Record Document 43-1 at 24. Title II of the ADA provides that "No qualified individual shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Public entities have been defined to include local governments and their instrumentalities, including jails. See Cadena v. El Paso County, 946 F.3d 717, 723 (5th Cir. 2020). Within jails, health care has been recognized as a service, program, or activity of a public entity. See Pennsylvania Department of Corrections v. Yeskey, 524 U.S. 206, 210 (1998).

The ADA also "imposes upon public entities an affirmative obligation to make reasonable accommodations for disabled individuals." Bennett-Nelson v. Louisiana Bd. of Regents, 431 F.3d 448, 454 (5th Cir. 2005). "To succeed on a failure-to-accommodate claim, a plaintiff must prove: (1) he is a qualified individual with a disability; (2) the disability and consequential limitations were known by the covered entity; and (3) the entity failed to make reasonable accommodations." Ball v. LeBlanc, 792 F.3d 584, 596, n.9 (5th Cir. 2015). Although plaintiffs usually alert defendants of their disability and request accommodations in direct and specific terms, an individual may prevail by

showing that the disability and consequential accommodations were "open, obvious, and apparent." Windham v. Harris County, Texas, 875 F.3d 229, 236 (5th Cir. 2017).

Plaintiff specifically argues Shreveport failed to accommodate Carter by turning or rolling him in bed throughout the day and night, providing a jail bed that would allow Carter to turn himself or get out of bed, or a special mattress that would create air flow between his body and the bedding. See Record Document 20 at ¶16. Plaintiff argues the Jailers' failure to assist him in changing his bandages also comprises this claim. See Record Document 57 at 21. In their Motion for Summary Judgment, Defendants take issue with Plaintiff's argument for a special mattress and argue the Jail's accommodations have been sufficient for other wheelchair-bound inmates in the past. See Record Document 43-1 at 24-25. They also argue Carter never asked for help and strongly contest whether Carter's need for assistance in treating his bed sores was open and obvious to the degree that officers should have known to accommodate him. See Record Document 77 at 10.

Without question, Carter is a qualified individual under the ADA deserving of reasonable accommodations known by Defendants. While Defendants argue they could not have known Carter's paralysis would limit him from caring for his own bed sores, the evidence presented thus far suggests otherwise. Plaintiff informed Defendants at the scene of Carter's bed sores and called the Shreveport City Jail daily to inquire as to their condition. See Record Document 43-15. Several jailing officers expressed their reasonable belief that Carter would have had difficulty changing his own bandages due to his paralysis. See Record Document 57-4 at Ex. TT; 57-7 at Ex. AC. Dr. Dixon himself included in his care instructions that Carter would require assistance with his dressing changes. See Record Document 57-5 at Ex. TD-1. Finally, Carter's sworn deposition

states he asked at least one officer how he would be expected to change his own bandages. See Record Document 57-6 at Ex. WC. The evidence thus far suggests that Defendants were aware of Carter's inability to change his own bandages due to his disability and could have assisted him in doing so.

However, Carter's claims for accommodations in the form of a different jail bed or special mattress lack support. Carter never requested such an accommodation, and any awareness of such a product by officers is unlikely. Further, Carter himself admits to sleeping on his couch at home; thus, such a mattress or bed was not truly necessary to protect his bed sores. See Record Document 43-14. Nevertheless, an unresolved factual dispute remains to whether Defendants should have reasonably accommodated Carter through frequent repositioning or daily bandage changes to prevent his bed sores from worsening. Plaintiff's ADA claims with respect to these health services may proceed to the trier of fact, however, the special bed or mattress accommodation claims cannot.

## CONCLUSION

Genuine disputes of material fact still exist with respect to each of Plaintiff's claims against the individual Defendants, with the exception of those against Lieutenant Joseph Dews. However, no such dispute exists as to Plaintiff's § 1983 claim against the City of Shreveport and summary judgment is appropriate. Consequently, Defendants' Motion for Summary Judgment is hereby **GRANTED IN PART** and **DENIED IN PART.**

An order consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** in Shreveport, Louisiana on this 21st day of January, 2021.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT